UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────────────

HAROLD D. CARTER,

                                Petitioner,

        v.

THOMAS POOLE, Superintendent,
      Five Points Correctional Facility,

                           Respondent.

9:04-CV-1386
(GHL)

───────────────────────────────────────

APPEARANCES:                       OF COUNSEL:

Harold D. Carter
Petitioner *pro se*
00-B-1740
Five Points Correctional Facility
P.O. Box 119
Romulus, New York 14541-0119

HON. ANDREW M. CUOMO          LUKE MARTLAND, ESQ.
Attorney General for the State of New York   Assistant Attorney General
 Counsel for Defendants
120 Broadway
New York, New York 10271

GEORGE H. LOWE, United States Magistrate Judge

## MEMORANDUM DECISION AND ORDER[1]

## I.    THE HABEAS PETITION

On December 1, 2004, Petitioner Harold Carter, *pro se*, filed a Petition under 28 U.S.C. §

2254 for a writ of *habeas corpus*.  He challenges the judgment entered on July 26, 2000, in

───────────────

[1] This matter is before the Court on the consent of both parties.  (Dkt. No. 16.)

1

Oneida County Court convicting him, after a jury trial, of two counts of second degree murder and two counts of second degree robbery and sentencing him to an indeterminate term of 25 years to life.  Petitioner's conviction was affirmed by the Appellate Division, Fourth Department, and leave to appeal to the Court of Appeals was denied.  *People v. Carter*, 767 N.Y.S.2d 539 (N.Y. App. Div. 2003); *leave denied People v. Carter*, 2 N.Y.3d 738 (N.Y. 2004).

## II.   **THE CLAIMS**

Petitioner argues that he is entitled to *habeas* relief on the following grounds:

1.   There was insufficient evidence that Petitioner's actions actually caused the victim's death.

2.   The trial court violated Petitioner's due process rights by allowing police officers to testify about conversations they overheard between Petitioner and his co-defendant.

3.   The trial court erred by admitting statements Petitioner made to the police.

4.   The trial court abused its discretion by denying Petitioner funds to secure an expert.

5.   The trial court violated Petitioner's due process rights by admitting gruesome photographs of the victim's body.

6.   Petitioner's confession was not sufficiently corroborated by independent proof as required by New York Criminal Procedure Law section 60.50.

7.   The sentence was unduly harsh, and thus violated Petitioner's Constitutional right to be free from cruel and unusual punishment.

(Dkt. No. 1 at 7A-7G.)

III.       **THE RELEVANT FACTUAL BACKGROUND**

Glenn Morgan was last seen alive on August 18, 1999.  It was his 73rd birthday.

At about noon, Morgan  went to the American Legion Hall to celebrate. (Trial Transcript

Vol. I ["T1"] at 187:23-189:3.) Morgan wore a red baseball cap with the initials "USMC." (T1.

at 189:16-18, 219:22-25.)  Mary Voorhees, also known as "Leather," came into the American

Legion Hall approximately one half hour after Morgan.  She was wearing a brown or black

cowboy hat. (T1. at 195:7-10, 214:4-11, 222:3-23, 223:17, 242:15-16.)  Leather sat down next to

Morgan's friend at the bar and asked Morgan to buy her a drink. She whispered to Morgan's

friend, "I like to suck," which the friend relayed to Morgan. (T1. at 237:21-239:15.)  Morgan

drank more than usual because it was his birthday.  He and Leather danced and periodically

exchanged hats. (T1. at 197:6-9, 213:5-7, 227:18-20; T2. at 27:8-16.)

Morgan and Leather left the American Legion Hall at around 3:30 p.m. (T1. at 199:1-2)

and went to several other bars throughout the course of the afternoon and evening.  They were

seen together at the Green Lantern between 3:15 and 3:30 p.m. (T2. at 150:12-152:10), the

Anchor Inn at approximately 4:30 p.m. (T2. at 42:2-44:6), and the Hylander Bar at approximately

5:30 p.m. (T2. at 286:10-289:8.)  Leather left the Hylander around 7:00 p.m., and Morgan was

seen leaving at some point before that. (T2. at 290:20-292:6.)

Around dusk, Leather and Morgan arrived at the home of Jay Rood and Regina Gardinier

on Whitesboro Street near the Hylander Bar. (T3. at 192:12-194:16, 208:9-15.)  Regina's

daughter went with Leather to pick up a pizza.  (T3. at 197:16-20, 209:8-13.) On their way back

3

to the house, they picked up Petitioner as he walked down the street[2].

At about the same time, Carole Zaniewski saw an elderly man wearing a big, white or tan colored hat walking west on Whitesboro Street a few blocks from the intersection of Whitesboro and Oriskany.   (T5. at 118:8-119:19, 123:5-11, 125:19-23, 140:9-12.)  His appearance caught her attention, and she watched him cross the street.  (T5. at 142:9-13.)  She watched him trip going up onto the curb.  He appeared to be drunk.  (T5. at 119:20-24.)  When she looked for him again in her rearview mirror, the man was gone. (T5.  at 120:1-2.) She could not positively identify the man as Morgan. (T5. at 136:8-11.)

After the pizza party, at 7:46 p.m., Petitioner bought a 12-pack of Keystone Ice beer at Rite Aid.  (T2. at 299:4-302:14.)

Between 8:00 p.m. and 8:30 p.m., Leather and a thin man in his early 30s with long hair arrived at the Green Lantern without Morgan[3]. (T2. at 68:12-69:11, 89:13-21.)  Leather had a car and a twenty-dollar bill, both of which were unusual for her.  (T2. at 71:3-72:15.)  Leather appeared to be restless and uneasy. (T2. at 80:8-11, 115:21-116:3.)  They stayed approximately

---

[2]      Although Mr. Rood and Ms. Gardiner's testimony regarding who was at their house that night was far from clear, Petitioner told the police that Leather and "a young girl" with a pizza picked him up as he walked down the street and took him to a party at a house on Whitesboro Street.  This is consistent with Mr. Rood's testimony that Leather had an older man and a younger man with dark hair with her that night.

[3]      The prosecutor never asked the bartender who testified to seeing Leather and the thin man whether she could identify the thin man as Petitioner.  On cross-examination, the bartender testified that a police officer who interviewed her in August 1999  told her that the thin man was Harold Carter.  (T2. at 97:5-99:16.)

twenty minutes and left. (T2. at 73:18-25.)  Leather and Petitioner[4] went to Sullivan's bar between 8:30 and 9:00 p.m., and stayed until the bartender refused to serve them and asked them to leave. (T2. at 276:1-282:24.)  Leather and Petitioner returned to the Green Lantern sometime after 10:00 p.m. Leather appeared more at ease. (T2. at 79:17-20, 80:6-7, 117:2-13.)

Morgan's family was expecting him for a birthday dinner.   When he failed to arrive and the family could not locate him, they contacted his son-in-law, Sean Finn, a police officer. (T1. at 68:7-74:8.)  Finn called the Utica Police Department and began searching for Morgan. (T1. at 87:13-88:2.)

At approximately 11:00 p.m., Officer James Watson located Morgan's car at the Green Lantern. (Transcript of April 17, 2000, *Huntley* hearing ("H") at 7:3-14; T5. at 47:11-50:12.)  Leather and Petitioner exited the bar and approached  the car.  (H. at 7:17-25; T5. at 51:12-22.)  Leather had the keys (T5. at 51:23-24), and was wearing Morgan's red baseball cap. (T3. at 220:8-221:5; T5. at 57:14-19.)  Watson asked them to identify themselves and they complied, giving their correct names.  (H. at 8:23-9:7; T5. at 52:3-13.)  Officer Watson asked them where Morgan was, and Leather said she did not know. (T5. at 54:9-10.)  Petitioner said Leather had come to his house, picked him up and brought him back to the Green Lantern to have a drink. (H. at 9:19-24.)  Petitioner denied having any contact with Morgan.  (T5. at 54:21-24.)

Soon, Sean Finn arrived on the scene.  (T5. at 56:23-25.)  Finn recovered Morgan's car keys and hat from Leather. (T5. at 58:10-17.)  He examined the car and noticed a twelve-pack of

---

[4]      The bartender at Sullivan's described Leather's companion as a slender man in his late 20s or early 30s with "darkish" hair.  (T2. at 278:16-279:2.)  The prosecutor never asked the bartender to identify the man as Petitioner.  As discussed below, Petitioner admitted that he went to Sullivan's with Leather.

Keystone beer inside. (T1. at 127:24-128:8.)

Leather was taken in for questioning.  (T2. at 83:18-23.)  Petitioner was allowed to go home.  (T1. at 108:1-4.)  Leather's and Petitioner's fingerprints were recovered from the car. (T5. at 20:2-22:6, 40:23-41:19.)

On August 20, 1999, New York State Police Investigators Allen Cordary and Pamela Morris were assigned to locate and interview Petitioner.  (T4. at 7:7-17; Transcript of April 28, 2000, *Huntley* hearing ("H1") at 3:13-20.)  They found Petitioner cleaning the bar located under his apartment.  (T4. at 7:24-9:1.)  Cordary asked Petitioner to accompany him to the State Police barracks at Marcy ("SP Marcy") and Petitioner agreed.  (T4. at 10:10-11.)  Petitioner did not appear to have been drinking, spoke clearly, and appeared to understand what Cordary said.  (T4. at 9:16-10:1.)  Cordary patted Petitioner down and Petitioner got in the back of the police car. (H1. at 28:9-17.)  Cordary read Petitioner his *Miranda* rights and asked Petitioner whether he understood his rights and whether he wished to talk to the police.  (T4. at 10:11-17, 12:19-13:11, 13:21-23.)  Petitioner said yes.  (T4. at 13:1-13.)

At SP Marcy, Cordary and Morris interviewed Petitioner in the "I.D. room."  (T4. at 15:4-16:10.)  Cordary asked Petitioner how he "became associated with a car that ... was the car of a missing person."  (T4. at 21:5-7.)  Petitioner said that he had been walking home from a friend's house when Leather pulled up behind him in the car.  (T4. at 21:25-22:5.)  There was another woman with her.  (T4. at 22:6-8.)  They went to a residence near the Hylander Bar and ate some pizza.  After that, Leather drove Petitioner to the Green Lantern.  (T4. at 22:9-12, 51:17-21.) Petitioner told Cordary that he never saw "the older gentleman."  (T4. at 23:11-12, 52:21-22.)

After the interview, which lasted about an hour and a half, Petitioner reviewed the written

6

statement that Cordary prepared.  (T4. at 24:6-21.)  Petitioner initialed each of the *Miranda* rights

listed at the top of the document, signed below the written *Miranda* warnings, initialed each

page, and signed and dated the bottom of the second page.  (T4. at 27:12-18.)  Petitioner did not

object to anything in the written statement or request any corrections.  (T4. at 28:21-29:8.)  After

Petitioner signed the statement, Morris fingerprinted him.  (T4. at 53:23-54:8.)  At about noon,

Cordary drove Petitioner home.  (T4. at 55:1-10.)

At about 3:30 p.m., Cordary and Morris returned to Petitioner's home and transported

him to SP Marcy.  (H1. at 47:17-48:14, H. at 50:6-14.)  For the next 24 hours, Petitioner

remained at the police station.

Beginning at about 4:30 p.m., Petitioner was interrogated in the interview room by

Investigators Timothy Blaise and Ken Dence.  (H. at 21:3-22:9.)  Petitioner told Blaise and

Dence that he had never seen Morgan.  (H. at 22:20-25.)

Petitioner was not allowed to leave the interview room until 8:05 p.m.  At that time, he

was given a break to drink some coffee.  (H. at 39:20, 40:12-14, 50:19-20.)  Thereafter,

Petitioner was given several breaks to drink water and coffee, use the restroom, and eat.  (H. at

45:25-46:4.)

After Blaise and Dence questioned Petitioner, he was interrogated by Senior Investigator

Graham.  (H. at 23:21-24:6.)  At about 10:45 p.m., Senior Investigator Graham came out of the

interview room and said "we are going to go for a ride down to Barnes Ave."  (H. at 24:25-25:3.)

Graham drove Petitioner to Barnes Avenue.  (H. at 25:5-11.)  When they arrived, Petitioner said

he did not know anything about Morgan being in that area, so after a few minutes they returned

to SP Marcy.  (H. at 25:21-25.)

Upon Petitioner's return to SP Marcy at about 11:30 p.m., he was questioned in the interview room by Investigators Lane Newton and Lyle Baxter.  (H. at 56:8-25, 58:21-25.) Petitioner was not given *Miranda* warnings.  (H. at 79:22-24.)  Petitioner continued to maintain that he had never seen Morgan.  (H. at 59:3-15.)

At about 1:00 a.m., Petitioner said he was getting tired.  (H. at 26:23-27:4, 51:12-15.)  He was not given the option of going home to go to sleep.  (H. at 93:17-19.)  Instead, the officers brought in some chairs for him to lie on and monitored him through the two-way mirror.  (H. at 93:17-19.)

At about 2:00 a.m., Blaise and Newton saw that Petitioner's eyes were open, so they entered the interview room and resumed the interrogation.  (H. at 27:4-9.)  At that point, Petitioner's story drastically changed.  (H. at 27:10-14.)  He said that when Leather pulled up behind him as he was walking home, the "elderly gentleman" was in the car with her.  (H. at 28:6-11.)  Petitioner got in the car for about twenty seconds, then remembered that he wanted to pick up some beer at a friend's house.  He jumped out of the car, picked up the beer at the friend's house and then returned to where the car had been.  The car was gone.  (H. at 28:11-16.) He was walking home when Leather and the elderly gentleman pulled up again.  The three of them drove to "some woman's" house and ate a pizza with several other people.  (H. at 28:16-22; 66:3-7.)  After they ate the pizza, Petitioner got back into the Saturn with Leather.  Somebody got in the back seat, but Petitioner did not see who it was.  (H. at 28:22-23:1.)  They drove to a Rite Aid, where Petitioner bought some beer.  When he got back into the car, he noticed that the elderly gentleman was there.  (H. at 29:1-5.)  From there, they drove to a pavilion on Barnes Avenue.  (H. at 29:5-6.)  Petitioner stayed in the car drinking a beer while Leather and the elderly

8

gentleman got out.  Petitioner saw them walk out of sight.  (H. at 29:8-11.)  About four minutes later, Leather returned alone, got into the car and sped down Barnes Avenue back into the city.  (H. at 29:13-18.)  Petitioner asked Leather where the elderly gentleman was.  Petitioner said they should turn around and try to find him.  (H. at 29:18-21.)  They drove back to the pavilion area and shined the high beams.  They did not see anyone.  (H. at 29:21-25.)  They returned to the city and went to the Green Lantern.  (H. at 29:25-30:1.)

After repeating this story for Investigator Dence, Petitioner was allowed to sleep at about 4:30 a.m.  (H. at 30:10-17, 32:16-19, 33:11-16, 52:2-4, 67:21-68:5.)

Cordary, who had gone home when his shift ended on August 20, returned to SP Marcy at about 7:00 a.m. on August 21.  (H1. at 18:5-16.)  He and Investigator Heidi Abrial were assigned to take Petitioner to Barnes Avenue.  (H1. at 18:17-20.)  They went to the pavilion that Petitioner described.  (H1. at 20:16-19.)  Petitioner told the officers where to look, but the search was unsuccessful.  (H1. at 21:8-18.)  They returned to the interview room at SP Marcy.  (H1. at 21:19-24.)

Abrial administered *Miranda* rights at 9:51.a.m.  (H1. at 22:7-16, 62:2-9.)  For the next five or six hours, until 3:30 p.m., the investigators took a statement from Petitioner.  (H1. at 23:16-24.)  Petitioner was given four coffee breaks during that time.  (H1. at 24:22-23.)  While giving the statement, Petitioner was cooperative, alert and coherent.  (H1. at 26:13-17.)  He never expressed a desire to leave.  (H1. at 26:21-23.)  No threats or promises were made to Petitioner in exchange for giving the statement.  (H1. at 27:2-4.)  Petitioner never asked for an attorney.  (H1. at 27:5-7.)  He never asked to use the telephone.  (H1. at 86:5-8.)  He never asked to talk to a family member or a friend.  (H1. at 86:9-14.)  The investigators gave Petitioner an opportunity to

review and correct the statement[5].  (H1. at 25:4-25.)  Cordary drove Petitioner home between 4:00 and 4:30 p.m.  (H1. at 27:8-16.)

On the morning of August 23, Investigators Dennis Dougherty and Michael Conroy picked Petitioner up at his home and brought him to SP Marcy to undergo a polygraph examination.  (H1. at 161:20-162:22; T4. at 164:7-25.)  The examination was administered by Senior Investigator Dennis J. Blythe.  Upon arriving at SP Marcy, Petitioner was escorted into the interview room.  (H. at 116:21-117:4.)  Blythe gave Petitioner a booklet explaining the polygraph procedure and left Petitioner alone to read it. (H. at 99:22-100:10.)  Blythe asked Petitioner if he had any questions and if he would be willing to take a polygraph.  (H. at 100:13-15.)  Petitioner did not have any questions and said he was willing to take the polygraph examination, so Blythe took him to the polygraph suite.  (H. at 100:15-16.)  Before entering the suite, Blythe asked Petitioner if he understood why he was there and whether he knew what was going to happen.  (H. at 101:14-19.)  Petitioner said he was there to take a polygraph about a missing person.  (H. at 102:13-16.)  Blythe told Petitioner that he was free to leave even in the middle of the polygraph session.  (H. at 101:21-24.)  Blythe asked Petitioner whether he had been forced or coerced in any way and Petitioner said he had not been.  (H. at 103:24-104:5.)  Petitioner signed a form giving Blythe permission to conduct the examination.  (H. at 104:5-10.)  Blythe then *Mirandized* Petitioner.  (H. at 104:11-12.)

During the examination, Blythe said "I am sure you want to get this over with.  You know, you want to get to the bottom of this and help us find Mr. Morgan."  Petitioner stated

---

[5]      Because the trial court ultimately suppressed this statement, it does not appear in the state court records that were submitted to this Court.  The witnesses at the *Huntley* hearing did not describe the contents of the statement.

"There is no body, therefore, there is no crime."  (H. at 109:10-25; T4. at 214:1-3.)  Later on, Petitioner commented that "All you've got is a stolen car, and they have got that back.  So that you have got nothing."  (H. at 110:2-4; T4. at 214:20-22.)  Still later, Blythe "was talking about feeling sorry about ... what happened that whole night" and Petitioner stated "Well, I will plead to manslaughter but not murder."  (H. at 110:5-9; T4. at 216:7-9.)

Later that afternoon, Dougherty briefly interrogated Petitioner.  Dougherty told Petitioner that the polygraph examination indicated that Petitioner was being deceptive.  Petitioner said he was trying to tell the truth.  (H1. at 136:16-21.)  Petitioner asked Dougherty what charges he potentially faced.  (H1. at 164:1-5.)  Dougherty told Petitioner that he was, in all likelihood, facing a charge of second degree murder.  Petitioner replied "Oh, I couldn't plead guilty to that.  I would plead guilty to manslaughter."  (H1. at 157:8-12.)  Petitioner was then taken home.

On August 24, Robert Buttenschon saw Petitioner walking toward the woods near the corner of Barnes Avenue and Oriskany Boulevard.  He knew Petitioner because Petitioner used to live in a tent near his house.  (T3. at 72:10-77:14.)  Buttenschon's father, who was doing yard work at a home on Oriskany Boulevard further west toward Whitesboro Street, saw Petitioner walking along the railroad tracks about 150 yards from the dog food factory.  (T3. at 85:8-87:15.)

On August 25, Dougherty and Investigator Michael Conroy picked Petitioner up at his residence a little before 9:00 a.m.  (H1. at 106:9-19.)  The officers asked Petitioner to come back to the station with them and he agreed.  (H1. at 107:23-108:9.)  In the car, Dougherty *Mirandized* Petitioner.  (H1. at 109:20-23.)  They arrived at SP Marcy at 9:30 a.m. and went to the interview room.  (H1. at 110:18-23.)  Dougherty told Petitioner that "there is no likelihood that [the victim] is any longer living, and that his family deserved closure to this case, that our victim ... deserved

11

to have a proper burial." (H1. at 111:10-16.) Petitioner appeared remorseful, so Dougherty

asked him to write a letter to Morgan's family expressing remorse and explaining his role in what

happened to him. Petitioner said he was willing to write the letter. (H1. at 111:22-112:3.)

Petitioner wrote for well over an hour, at times conversing with Dougherty. (H1. at 112:23-

114:2.) In the letter, Petitioner stated that:

> On August 18, 1999, I was walking down a street, minding my own
> business ... As I was walking, Leather pulled up in Glenn's car. She
> asked me if I wanted to party with them ... I got in the car with
> Leather. We drank a lot of beer. Glenn seemed like a nice guy ...
> Leather has a reputation of hustling old men ... [S]he asks them to buy
> her drinks and takes them to a secluded area and takes their money
> and takes their vehicle. Unfortunately, Glenn had some money that
> night, and she wanted it ... [S]he drove us to Barnes Ave. (A
> secluded area off Barnes Ave.) She got Glenn out of the car, then
> took him back into the woods. This is where I made the biggest
> mistake of my life. I knocked Glenn down, maybe a little harder than
> I should have.

(T4. at 90:5-17.) When Petitioner reached the bottom of the third page, Dougherty said "You

know, I want you to finish this letter, but I want more to find that body." (H1. at 114:21-22.)

Petitioner agreed to take Dougherty to Morgan's body. (H1. at 114:23-24.) Dougherty and

Conroy drove Petitioner to an area on Barnes Avenue near Oriskany Boulevard. (H1. at 115:9-

22.) Petitioner pointed and told Dougherty and Conroy "the body's over there." (H1. at 115:25-

116:10.) Dougherty, Conroy and Petitioner searched the area but did not find Morgan's body.

(H1. at 116:16-117:10; T4. at 102:9-24.)

   At about noon, they returned to SP Marcy to take a formal written confession from

Petitioner. (H1. at 117:11-18; T4. at 103:1-10.) Dougherty and Conroy took Petitioner into

Senior Investigator Jack Graham's office. (T4. at 103:12-13.) They advised Petitioner again of

his *Miranda* rights.  (H1. at 118:11-16; T4. at 107:8-108:18.)   Petitioner agreed to give a

statement.  The statement said that on August 18, Petitioner was:

> walking to a friends house ... Before I got to [his] house, I saw a girl
> that I know as Leather ... She was driving a 1999 dark green four-door
> Saturn ... Leather had a gray-haired, older man in the front seat with
> her.  She was driving.  Leather asked me if I wanted to go for a ride
> and drink some beer.  I said I did.  I got into the car for only a short
> time, about ten seconds, when I told Leather to stop the car because
> I wanted to go get some beer that I had left behind [at my friend's]
> house in a cooler.
>
> I then got out of the car and walked to [my friend's] and picked up a
> six-pack of Keystone Ice beer, and Leather drove off in the Saturn.
> Once I got the six-pack, I stood on the corner of Schuyler and
> Oriskany, waiting for her to come back.  I waited for about 15
> minutes and she had not returned so I started ... walking home.
>
> I got to my street ... when I saw Leather again in the same car.   She
> stopped to pick me up.  This time she didn't have the old guy with
> her, but she had a young girl as a passenger.  The girl was heavy set,
> with short brown hair.
>
> When I got in the car, she said "Let's go party."  I asked her where the
> older guy was, and she said at the party ... She said that she and the
> younger girl had already picked up a pizza and were on their way to
> the party.
>
> When we arrived at the party, it was already dark.  The party was in
> a house which is next to the Hylander Bar on Whitesboro Street.
> Leather and the young girl went into the house, and I stayed outside
> next to the car.
>
> I asked where the old man was, and Leather told me that the old man
> was in the house.  I was standing outside next to the car ...Leather
> then came out of the house and jumped into the car and said to me,
> "Let's go for a ride."
>
> I was the only passenger in the car, and we drove around most of the
> city of Utica.  As she was driving, we were both drinking beer.
> Leather also allowed me to drive the car too.  We drove around
> together, maybe one half hour or more.

13

We then drove back to the party on Whitesboro Street. I know we got to the party before 9:00 p.m., because we later went to the Rite Aid Drug Store to get some more beer. I know that Rite Aid closes at 9:00 p.m.

I walked from the party on Whitesboro Street to the Nice 'N Easy Convenience Store, also on Whitesboro Street. But the beer was too expensive, so I walked back to the party and met up with Leather again.

This time she had the old guy with her. The old guy was the owner of the car. I have since learned that his name was Glenn Morgan. Leather was now driving, and I was in the front seat, and Glenn was in the right rear seat, behind me.

We drove to ... Rite Aid ... I went alone to buy the beer. I purchased a 12-pack of Keystone Ice, paying $4.91. Leather had given me the money to buy the beer. I didn't ask Leather where she had gotten the money.

I got back in the car, and she drove directly to Barnes Avenue in the city of Utica. This is an isolated area that Leather usually takes her tricks.

Leather hustles old men. She meets them in bars, gets them to buy her drinks, and then she takes them to an area like Barnes Ave. where she generally has oral sex (blowjobs), then rolls them. She gets their money and takes their vehicles or whatever she can get.
She had been doing this for years, and I knew her routine. We had already planned to roll Glenn.

Leather said that she really loved the car and wanted to keep it. She said "Do you want some money to go out drinking afterwards?" And I said "Yes." I then agreed to ... help her roll him. Glenn was in the back seat, drunk, so we whispered about what we were going to do. Once we got to the pavilion, which is on a dirt road off Barnes Avenue, Leather said that she wanted to thank the old man. By this, I knew she meant giving him a blowjob, and then she would take his money. Before she went into the woods with the old man, she said to me "Let's do it." Both Leather and Glenn were sitting at the pavilion drinking beer when Leather started to give Glenn a blowjob. The plan was once he dropped his pants, she would reach in and take his wallet.

14

As she started to give him a blowjob, I got out of the car and walked up behind the guy and shoved him to the ground with the intentions of taking his money.  I didn't mean to hurt him.  I only wanted to knock him down and get his money.

He fell over the top of Leather as she was on ... her knees, starting to give him a blowjob.  Once he fell on the ground, I saw that he was still breathing.

I walked back to the car and sat down.  She came back a short time later and got into the driver's seat of the car.  She had his wallet, which she had placed under the front seat of the car.  She said "Let's get the hell out of here."

We then took off, driving crazy down Barnes Avenue to Oriskany Boulevard.  She was driving fast.  I said "Where's the guy?"  And she said "He's back there."  I said "We can't just leave him there."  We had to get him to civilization.  She said "I'm not going back there." I said "Stop the car so I can drive."

So I drove back to the entrance of the road that goes back to the pavilion.  At this point I told her to drive, in case I saw the old man so I could get out and help him.  We didn't see him on the road, and when we got to the pavilion, I got out of the car and went over to where he was lying.  He was still breathing, and I helped him ... off the ground.  I helped him into the back seat, and I got into the front passenger seat.

Leather drove ... around town again, and the old man sat in the back seat, but said nothing.  She stopped at different bars and left the old man in the car while we went in and drank.

We first went to Sullivan's Bar ... The bartender didn't serve us, so we left, and drove to the Drift Inn.

We parked out back.  The old man was still in the back seat.  When we got to the car, he appeared to be breathing.

When we got inside, Leather went to the ladies' room, and I went to the bar.  I waited at the bar for her for at least 15 minutes.  I then went to the ladies' room to see where she was.  She was standing by the door and said that she wanted to go to the Green Lantern ...

15

> We got into the car and went to the Green Lantern.   I looked in the back seat, and he was not there.   Leather said she had gotten him some help.
>
> When we got to the Green Lantern, we went inside and drank some beer.  About ten minutes later, a Utica cop came into the bar and asked who owned the green car.

(T4. at 132:13-139:21.)

Petitioner completed his statement shortly after 4 p.m.  (H1. at 122:11-14; T4. at 111:21-112:4.)  After it was completed, Petitioner had the opportunity to read through it and make any additions, corrections or deletions.  (H1. at 123:1-10.)  He did not make any changes to the statement.  (T4. at 114:12-15.)

Between 4:30 and 5:00, Abrial spoke to Petitioner in Senior Investigator Graham's office. (H1. at 67:3-11.)  Abrial read Petitioner his *Miranda* rights.  (H1. at 67:25-68:4; T4. at 178:12-17.)  She then appealed "to his sense of heart to maybe give us a little more information as to the whereabouts of Glenn Morgan's body."  (H1. at 69:22-24; T4. at 180:4-11.)  Petitioner asked what he could be charged with.  When Abrial told him that he could be charged with second degree murder, Petitioner said "Can't do murder.  I can do manslaughter."  (H1. at 70:1-5; T4. at 180:14-181:1.)  Petitioner did not provide Abrial with any more information.  (H1. at 70:6-11.)

Abrial and the other investigators then decided to put Petitioner and Leather together. (H1. at 70:13-16; 125:18-23; T4. at 142:4-6.)  Petitioner and Leather were put in the interview room together with Dougherty, Blythe and Conroy.  (H1. at 70:20-24; 126:8-12.)  Petitioner and Leather were sitting on one side of the table and the three investigators were on the other side of the table.  (H1. at 71:25-72:2.)  Leather said "Harold, it's all over.  We've got to tell them the truth.  We've got to tell them where Mr. Morgan is.  He's a nice old man.  Let's do the right

thing here."  (H1. at 126:19-24.)  Petitioner said "If they don't have a body, they don't have a

case."  (H1. at 127:2-4.)  Leather said to Petitioner "Tell them what we did with Glenn.  Tell

them about putting him in the two garbage bags and leaving his body by the boat launch ... Tell

... them about how we later went back and we picked up his body and we dumped it in a

dumpster."  (T4. at 144:6-11.)  Petitioner nodded and agreed with everything Leather said.  (T4.

at 155:20-25.)

Abrial, who was monitoring them from a different room, saw Leather giving Petitioner

"cues as to what to say, like he was feeding off her, like looking at her."  Abrial entered the

interview room and sat on the table between Petitioner and Leather so Petitioner did not have eye

contact with Leather.  (H1. at 72:2-5; 127:10-22; T4. at 183:20-184:13.)  Abrial kept asking

Petitioner where the victim was.  Sometimes she placed her hands gently on his face to get him to

focus on her.  Petitioner replied four times "No body, no crime."  (H1. at 72:10-15; T4. at 185:3-

186:8.)

The investigators then asked Petitioner and Leather if they would show them the

dumpster where they had placed the victim.  Petitioner agreed.  (H1. at 73:3-11.)  Petitioner and

Leather directed the investigators to a dumpster near a dog food factory off of Oriskany

Boulevard, on a service road running parallel to the railroad tracks.  (H1. at 128:20-129:11; T4.

at 145:10-16, 147:2-3, 191:3-4.)  They did not discover Morgan's body during the search.  (H1.

at 74:5-6.)

They arrived back at SP Marcy at 6:30 or 7:00 p.m. and took Petitioner back into the

interview room to give another statement.  (H1. at 129:18-23.)  Dougherty *Mirandized*

Petitioner[6].  The statement said:

> After I struck Glenn, he was unconscious.  Leather and I then carried him to the car and placed him in the back seat of the car.  We then took him to the boat launch, put his body in two plastic garbage bags and left.  Leather and I then went drinking and returned to the boat launch later that night.
>
> When we returned, the body was just the way we had left it.  I reached under the plastic bag, and he was cold.
>
> I then placed him in the trunk of his car and took him to a dumpster.  Leather and I then threw the body in the dumpster.

(T4. at 160:8-21.)  Petitioner reviewed the statement and signed it.  (H1. at 131:19-132:5.)

After giving the statement, Petitioner was arrested and charged with first degree robbery.

(H1. at 74:7-8; 132:17-19; T4. at 195:9-13.)

Investigator David Krause was directed to take Petitioner and Leather to court for their

arraignments.  (H1. at 94:24-95:11; T4. at 228:25-229:1.)  On the way,  Krause overhead Leather

asking Petitioner to "cooperate with ... the police in establishing the location of [the] body."

Petitioner said, two or three times, "No body, no crime."  He also said "They still don't have a

body.  They still don't have a body."  (H1. at 97:9-19; T4. at 230:4-19; T4. at 233:16-2.)

Morgan's body was not discovered until August 27, 1999.  A  passerby noticed a foul

smell coming from a wooded area near the intersection of  Whitesboro Street and Oriskany

Boulevard.  (T2. at 205:2-207:7; T4. at 199:9-10.)  Police found Morgan's body near the bottom

of an embankment, 39 feet from the road.  (T3. at 120:3-13.)  The body was badly decomposed

---

[6]        At the *Huntley* hearing, Dougherty testified that he read Petitioner his *Miranda* rights from a form prior to taking Petitioner's statement.  (H1. at 130:15-131:11.)  At trial, Dougherty testified that he did not recall advising Petitioner of his *Miranda* rights until the statement was completed.  (T4. at 151:18-152:1.)

and had to be identified through dental records. (T3. at 9:22-10:15, 164:21-165:3.)  Morgan's

pants were unbuckled.  (T3. at 125:2-4).  Police found Leather's cowboy hat seven or eight feet

from the body. (T3. at 131:6-13; T4. at 204:18-21.) Morgan's shoes were found a foot and a half

away from his body, sitting on their soles.  (T3. at 125:22-126:22.)  The shoe laces were untied.

(T3. at 139:23-25.)  There was no identifiable evidence of external injury to the body.  (T3. at

14:4-6.)  There was no clear unobstructed path from the roadway to the body. The area between

the roadway and the body was covered with thick vegetation and small saplings.  (T3. at 121:9-

16.)  None of the saplings was broken.  (T3. at 137:24-25.)

Petitioner was ultimately charged with two counts of second degree murder, one count of

first degree robbery and two counts of second degree robbery.  Petitioner moved to suppress his

statements to the police.

On April 17 and April 28, 2000, the trial court conducted a *Huntley* hearing[7].  Watson,

Blaise, Newton, Blythe, Cordary, Abrial, Krause and Dougherty testified for the prosecution.

There were no defense witnesses.

On May 5, 2000, the trial court issued a written order finding that Petitioner's

"constitutional rights were violated commencing on the afternoon of August 20, 1999, and

concluding with his return home on August 21, 1999."  The trial court held that all the statements

Petitioner made during that time were involuntary because Petitioner had been in police custody

for more than 24 hours, was placed in one room at the police barracks where he slept on chairs,

and was interrogated by police investigators who had been able to go home and rest while

Petitioner remained in custody.  The trial court held that Petitioner's August 23 and 25, 1999,

---

[7]     *People v. Huntley*, 15 N.Y.2d 72 (1965).

19

statements were admissible because they were sufficiently attenuated from the earlier statements. (Dkt. No. 19-4.)

Trial commenced on May 30, 2000.  (T1. at 4:1-2.)  Petitioner and Leather were tried together to separate juries.  The prosecution called 36 witnesses.  The defense called one witness, Carole Zaniewski.

The prosecution theory was that Petitioner encountered Leather and Morgan on their way to the pizza party, that Petitioner and Leather decided to rob Morgan, that they took him to the pavilion where Petitioner knocked out Morgan while Leather distracted him, that they used Morgan's car and money to go drinking, that they moved his body from the pavilion to a dumpster sometime between their first trip to the Green Lantern and their last, and that Petitioner lied to the police for a week about the body's location because he believed that he could not be charged with murder if the body could not be found.  In his closing argument, the prosecutor said he did not know how Morgan's body ultimately ended up so far west of the pavilion.  (T6. at 43:17-44:7.)  However, he pointed out that Petitioner had been seen walking through the woods in the area west of the pavilion several days after Morgan disappeared.  (T6. at 63:2-23.)

The defense theory was that after leaving Leather at the Hylander Bar at about 6:30 p.m., Morgan walked west on Whitesboro Street toward the American Legion.  Carole Zaniewski saw him on Whitesboro Street eight blocks west of the Hylander.  About four blocks west of that location, near the intersection of Whitesboro and Oriskany, Morgan stopped to relieve himself[8]. He unbuckled his pants, stepped over the guardrail, and fell down the embankment to his death.

---

[8]      The autopsy revealed that Morgan's bladder was empty, which indicated that he had urinated shortly before he died or that he had not had anything to drink prior to his death. (T3. at 49:23-50:6.)

(T6. at 8:12-9:16.)

The jury found Petitioner guilty of both counts of second degree murder and both counts of second degree robbery.  The jury acquitted Petitioner of first degree robbery.  (T6. at 177:7-178:19.)  For each of the robbery counts, Petitioner was sentenced to serve 15 years with five years' post-release supervision.  (S. at 18:13-23.)  For each of the murder counts, Petitioner was sentenced to 25 years to life.   (S. at 18:24-19:8.)  The sentencing judge noted Petitioner's complete lack of emotion and remorse throughout the process and said he wished he could impose a minimum sentence of more than 25 years.  (S. at 19:9-12.)

Petitioner appealed, raising the same arguments presented in his *habeas* petition.  (Dkt. No. 12, Ex. A.)  The Fourth Department affirmed.  (Dkt. No. 12, Ex. C.)  The Court of Appeals denied leave to appeal on March 15, 2004.  (Dkt. No. 12, Ex. D.)

Petitioner filed his petition for writ of *habeas corpus* in this Court on December 1, 2004.  (Dkt. No. 1.)  Respondent opposed the petition.  (Dkt. Nos. 11-12.)  Petitioner filed a traverse.  (Dkt. No. 13.)  Respondent opposed the traverse.  (Dkt. No. 14.)  At the Court's request (Dkt. No. 17), Respondent submitted the transcripts of the *Huntley* hearing and a brief regarding the admissibility of Petitioner's statements to police.  (Dkt. Nos. 19, 25.)  In response, Petitioner filed another traverse.  (Dkt. No. 26.)

## IV.   DISCUSSION

### A.   STANDARD OF REVIEW

When reviewing a habeas petition, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.  28 U.S.C. § 2241(c) (2006).  Relief does not lie for errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991); *DiGuglielmo v. Smith*, 366 F.3d 130, 136-137 (2d Cir. 2004).   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Petitioner may obtain habeas relief by showing that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1) (2006); *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Campbell v. Burgess*, 367 F. Supp. 2d 376, 380 (W.D.N.Y. 2004).  "By 'contrary to,' the state court decision may be either contrary to Supreme Court precedent on a question of law or the state court decision is opposite to a relevant Supreme Court case with 'materially indistinguishable' facts."  *Johnson v. West*, No. 9:04-cv-751, 2007 WL 952058 at *2 (N.D.N.Y. Mar. 29, 2007), *quoting Williams v. Taylor*, 529 U.S. 362, 405-406 (2000).  A state court unreasonably applies federal law when the state court correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner.  *Johnson v. West*, 2007 WL 952058 at *2 (*quoting Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).  Although "some increment of incorrectness beyond error is required" in order to grant a federal habeas application, that increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000); *see also Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006).  The state court's determination of a factual issue is presumed to be correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254 (e)(1) (2006); *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005), *cert. denied* 546 U.S. 884 (2005); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001).

##### B.        SUFFICIENCY OF EVIDENCE REGARDING THE CAUSE OF DEATH

Petitioner argues that the forensic pathologist's testimony was insufficient to satisfy the People's burden of proving beyond a reasonable doubt that Petitioner caused the victim's death. (Dkt. No. 1 at 7A.)

A challenge to the sufficiency of the evidence is amenable to federal habeas review. *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir.2002) (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir.1993)); *Norris v. Fischer*, No. 06 CV 2190, 2007 WL 1452127, at *7 (E.D.N.Y. May 15, 2007). The Appellate Division rejected Petitioner's contention that "the evidence was legally insufficient to support the conviction because the medical examiner was unable to determine a cause of death as a result of the extensive decomposition of the body." *People v. Carter*, 767 N.Y.S.2d 539, 540 (N.Y. App. Div. 2003).  The Appellate Division reasonably applied clearly established Supreme Court precedent.

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime(s) with which he is charged. *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); *In re Winship*, 397 U.S. 358, 364 (1970). This inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). A *habeas* petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *Schlup v. Delo*, 513 U.S. 298, 323 n.

23

38 (1995). The reviewing court is required to consider the evidence in the light most favorable to

the prosecution, and draw all inferences in its favor. *Jackson*, 443 U.S. at 319.

Under New York law, charges of second degree murder under either a felony-murder

theory or a depraved indifference theory require the prosecution to prove beyond a reasonable

doubt that, *inter alia*, the defendant "cause[d] the death of another person."  N.Y. Penal Law §§

125.25(2)-(3) (McKinney 2004).  In order to find causation, there must be evidence that the

defendant's

> actions [were] an actual contributory cause of death, in the sense that
> they forged a link in the chain of causes which actually brought about
> the death.  An obscure or a merely probable connection between an
> assault and death will ... require acquittal ... A defendant's acts need
> not be the sole cause of death; where the necessary causative link is
> established, other causes, such as a victim's preexisting condition,
> will not relieve the defendant of responsibility for homicide.

*Matter of Anthony M./People v. Cable and Godbee*, 63 N.Y.2d 270, 280 (1984).

Here, the evidence was sufficient for the jury to find that Petitioner caused Morgan's

death.  Although the forensic pathologist who performed the autopsy on Morgan's body testified

that the cause of death could not be determined due to the condition of the body (T3. at 25:13-

26:13, 66:12-14), the autopsy revealed that one of Morgan's arteries was 100% blocked and that

the other two arteries were mildly blocked.  (T3. at 19:11-16.)  This blockage put him at a greater

risk of stroke or heart attack.  (T3. at 22:5-12.)  External factors, such as being placed in fear,

being enraged, or being physically attacked can precipitate a heart attack in an individual at risk.

(T3. at 24:11-22.)  Petitioner admitted that he "shoved [Morgan] to the ground," rendering him

unconscious, and left him lying near the boat launch.  Based on this evidence, a trier of fact could

rationally find beyond a reasonable doubt that Petitioner "forged a link in the chain of causes

which actually brought about" Morgan's death.  Accordingly, Petitioner is not entitled to *habeas* relief on this ground.

### C.   TESTIMONY REGARDING CONVERSATIONS BETWEEN PETITIONER AND HIS CO-DEFENDANT

Petitioner argues that the trial court violated his Sixth Amendment right to confront the witnesses against him by allowing police investigators to testify about conversations they overheard between Petitioner and Leather.  (Dkt. No. 1 at 7B.)  This claim is procedurally barred.

Generally, a federal court may not reach the merits of a petitioner's *habeas* claim if the state courts' rejection of the petitioner's federal claim rested "on a state law ground that is independent of the federal question and adequate to support the judgment.[9]"  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  "To determine whether a state procedural bar is adequate to support the judgment, a federal habeas court should look to whether the state rule at issue is firmly established and regularly followed."  *Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. 2008).  The Second Circuit has held that New York's preservation rule, which precludes appellate review of an issue if a criminal defendant fails to contemporaneously object to the alleged legal error at trial, is firmly established and regularly followed, and thus qualifies as an 'adequate and independent state ground'.  *Richardson v. Greene*, 497 F.3d 212, 217-220 (2d Cir. 2007).  When the state court bases its decision on an independent and adequate state procedural bar, a petitioner may only seek *habeas* review if he or she shows "cause for the default and prejudice resulting

---

[9]      The state court must clearly and expressly state that its judgment rests on the state procedural bar.  *Levine v. Commissioner of Correctional Services,* 44 F.3d 121, 126 (2d Cir. 1995).  Where the last reasoned state court opinion on the petitioner's claim explicitly imposes a procedural default, it is presumed that later decisions rejecting the same claim without explanation did not silently disregard the procedural bar and consider the merits.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

therefrom." *Levine v. Commissioner of Correctional Services,* 44 F.3d 121, 126 (2d Cir. 1995).

Here, the opinion of the Appellate Division was "the last reasoned state court opinion on

the petitioner's claim" because the Court of Appeals summarily denied leave to appeal. *People*

*v. Carter*, 2 N.Y.3d 738 (N.Y. 2004). The Appellate Division stated that:

> By failing to object to the testimony of two police witnesses who
> testified with respect to a conversation they overheard between
> [Petitioner] and [Leather], [Petitioner] failed to preserve for our
> review his contention that the admission of that testimony violated his
> constitutional right of confrontation, and we decline to exercise our
> power to review that contention as a matter of discretion in the
> interest of justice.

*People v. Carter*, 767 N.Y.S.2d at 540. Thus, the state court based its decision on an

independent and adequate state procedural bar, namely, New York's preservation rule.

Accordingly, this Court may only review Petitioner's claim if he demonstrates cause for the

default and prejudice resulting therefrom.

Petitioner did not make any attempt in the Petition to show cause for the default. In his

traverse, Petitioner argues that the failure to preserve his claim "only serves to affirm the

ineffective assistance of trial counsel." (Dkt. No. 13 at 8.) Petitioner's belatedly-asserted

ineffective assistance claim is unavailing. A "petitioner may not bring an ineffective assistance

claim as cause for a default when that ineffective assistance claim itself is procedurally barred."

*Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997). Petitioner's ineffective assistance claim is

procedurally barred because he did not raise it on direct appeal in the state courts[10]. *Id.* at 138-

---

[10]     Petitioner's appellate counsel noted that "no objection was interposed" to the
officers' testimony regarding Petitioner's conversations with Leather, but urged the Appellate
Division to consider Petitioner's argument in the interests of justice pursuant to New York
Criminal Procedure Law section 470.15(6)(a). (Dkt. No. 12, Ex. A at 23.) Despite the appellate
attorney's recognition of the possible procedural default, he did not raise an ineffective assistance

140.  Thus, Petitioner has not demonstrated cause for his procedural default.

As a result of Petitioner's failure to show cause for his procedural default, this Court need not decide whether Petitioner suffered prejudice because, absent proof that the failure to consider the merits of the claims would result in a fundamental miscarriage of justice (and there is no such proof here), federal *habeas* relief is unavailable as to procedurally barred claims unless **both** cause and prejudice are established.  *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *McLeod v. Moscicki*, Civ. No. 02-9335, 2003 WL 22427757, at *8 (S.D.N.Y. Oct. 22, 2003) (citing *Murray*, 477 U.S. at 494); *You v. Bennett*, Civ. No. 00-7514, 2003 WL 21847008, at *7 (E.D.N.Y. July 29, 2003) (citing *Coleman*, 501 U.S. at 750); *Ayuso v. Artuz*, 2001 WL 246437, at *9 (S.D.N.Y. Mar. 7, 2001); *Pou v. Keane*, 977 F. Supp. 577, 581 (N.D.N.Y. 1997) (Kahn, J.).  Therefore, Petitioner is not entitled to *habeas* relief on this ground.

###    D.     PETITIONER'S STATEMENTS TO POLICE

Petitioner argues that the trial court erred by admitting the statements he made to Watson at the Green Lantern on August 18, to Cordary on the morning of August 20, and to various officers on August 23 and 25.  (Dkt. No. 1 at 7C.)  Petitioner argues that the state trial court should have suppressed those statements in addition to suppressing the statements he made from the afternoon of August 20 through the morning of August 21.

To analyze this issue, the Court must first determine whether Petitioner's statements on the afternoon of August 20 through the morning of August 21 were coerced.   This is because although statements following a coerced statement may be suppressed under the exclusionary rule, "the exclusionary rule does not reach to exclude a subsequent properly warned voluntary

---

of trial counsel argument.

27

confession as 'the alleged fruit of a *noncoercive Miranda* violation.'" *Thompson v. United States*, 821 F. Supp. 110, 121 (W.D.N.Y. 1993) (quoting *Oregon v. Elstad*, 470 U.S. 298, 304-09 (1985)) (emphasis added).  Thus, if Petitioner's August 20-21 statements were not coerced, the officers' administrations of *Miranda* warnings on August 23 and 25 rendered those statements admissible.

On *habeas corpus* review, the issue of coercion is a legal question, based upon a totality of the circumstances and requiring an "independent federal determination." *Nelson v. Walker*, 121 F.3d 828, 833 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Id*. (quoting *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988)).  The trial court's factual findings are entitled to a presumption of correctness. *Nelson*, 121 F.3d at 833-34; *see also Towndrow v. Kelly*, 98-CV-0509, 2000 WL 33743385, at *4 (N.D.N.Y. Dec. 20, 2000) ("Factual findings relevant to the voluntariness of a habeas petitioner's confession made by the state court are entitled to the presumption of correctness.").

Here, the trial court made detailed factual findings in support of its conclusion that Petitioner's statements to the police on the night of August 20 continuing through the morning of August 21  were involuntary.  Specifically, the trial court found that Petitioner

> was transported to Marcy by the State Police, and had no opportunity to return home until such time as the police determined to take him there.  He was continuously in their custody for more than 24 hours, and by and large was confined to one room at the barracks. [Petitioner] was even made to sleep on chairs in that one room, a circumstance that can hardly be described as in any way comfortable. He was under interrogation for a significant percentage of the time he

28

> was at Marcy, and was examined by teams of investigators ... In fact,
> as the investigators tired, another team would be sent in to continue
> the interrogation.  Some of the investigators, in fact, concluded their
> tour of duty with [Petitioner] present on August 20, 1999, went to
> their homes overnight, and returned, presumably refreshed, on August
> 21, 1999, while [Petitioner] remained at the barracks.

(Dkt. No. 19-4 at 17.)  The trial court's findings were based upon an extensive development of

the record via a two-day *Huntley* hearing involving the testimony of multiple witnesses. The

Appellate Division affirmed those findings.

Respondent argues that the totality of the circumstances indicates that Petitioner's

statements were not coerced.  In particular, Respondent notes that Petitioner was not handcuffed,

that he never asked to leave, that he never asked for a family member or an attorney, and that he

was given food and drinks.  (Dkt. No. 25 at 14-15.)  The factors noted by the trial court outweigh

the factors noted by Respondent and the totality of the circumstances indicates that Petitioner's

statements on the afternoon of August 20 through August 21 were not voluntary.  I find,

therefore, that the state courts properly suppressed those statements.

"When a prior statement is actually coerced, the time that passes between confessions, the

change in place of interrogations, and the change in identity of the interrogators all bear on

whether that coercion has carried over in the second confession."  *Elstad*, 470 U.S. at 310.

"Moreover, the court may take into consideration the continuing effect of the prior coercive

techniques on the voluntariness of any subsequent confession ...Whether effective *Miranda*

warnings preceded the subsequent statements is also a relevant inquiry."  *United States v.*

*Karake,* 443 F.Supp.2d 8, 86 -87 (D.D.C.2006) (citations omitted).  Other relevant factors

include whether the criminal defendant "remained in custody following the first confession and

through the second, whether he was denied access to counsel, and whether he initiated contact with authorities before his second confession." *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992).  *See United States v. Lopez*, 437 F.3d 1059 (10th Cir. 2006); *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993); *Leon v. Wainwright*, 734 F.2d 770 (11th Cir. 1984).

The state courts reasonably applied clearly established federal law by finding that Petitioner's statements on August 23 and 25 were sufficiently attenuated from his earlier statements and admitting the later statements at trial.  More than a day passed between Petitioner's interview with Cordary and Abrial on August 21 and his polygraph examination on August 23.  *Compare United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993) (second confession occurred only "minutes after the initial encounter").  Petitioner's first interview on August 23 occurred in a different location than the interviews on August 20-21.  With the exception of some brief questioning by Abrial, the officers who interviewed Petitioner on August 23 and 25 were not the same officers who conducted the sessions on August 20-21.  None of the officers involved in the August 20-21 questioning used coercive techniques that were likely to have any continuing effect on Petitioner, such as threats, promises, or the use of force[11].  Petitioner never requested counsel and was thus not denied access to counsel.  Effective *Miranda* warnings preceded the questioning on August 23 and 25.  Petitioner did not remain in custody following the August 20-21 interviews.  Rather, he was returned to his home, where he remained for a full day without any surveillance.  Accordingly, the state court properly applied clearly established federal law and *habeas* relief is denied on this ground.

---

[11]     In his second traverse, Petitioner asserts for the first time that the officers used force and threats of force.  (Dkt. No. 26 at 1-3.)  However, no evidence of such force was presented at the *Huntley* hearing or at trial.

### E.   EXPERT FUNDS

Petitioner argues that he was "denied a fair trial by the trial court's abuse of discretion in denying [Petitioner] funds to secure an expert." (Dkt. No. 1 at 7D.)  This claim is not cognizable on federal *habeas* review because there is no federal constitutional requirement that a criminal defendant be appointed an expert at the public expense. *Wilson v. Goord,* No. 00 Civ. 4849 (LTS), 2004 WL 226149, at *7 (S.D.N.Y. Feb. 6, 2004); *Welch v. Artus*, No. 03-CV-865S, 2007 WL 962931, at *17 (W.D.N.Y. Mar. 29, 2007).  Therefore, the Petition is denied on this ground.

### F.   PHOTOGRAPH

Petitioner argues that the admission of a photograph of Morgan's decomposed body violated his due process rights.  (Dkt. No. 1 at 7E.)

Generally, evidentiary issues do not present federal questions or implicate the Federal Constitution. *E.g., Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) ( "[E]rroneous evidentiary hearings do not automatically rise to the level of constitutional error."). The admissibility of photographs of homicide victims is a matter of New York law.  Under New York law, homicide victims' corpses are generally admissible when they tend to prove or disprove some material fact in issue, even if the photographs portray a gruesome spectacle. *People v. Pobliner*, 32 N.Y.2d 356, 369-70, 345 N.Y.S.2d 482, 493, 298 N.E.2d 637 (1973).

Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quotation omitted).  "Where

the prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process." *Dunnigan v. Keane*, 137 F.3d 117,125 (2d Cir. 1998) (quoting *Estelle v. McGuire*, 502 U.S. at 69).

Here, the photograph showing the condition and location of Morgan's body was probative of an essential element in the case. Petitioner contended at trial, as he does in this proceeding, that the evidence of his guilt was insufficient because the forensic examiner could not determine a precise cause of death. See IV.B above. The examiner explained at trial that this was due to the condition of the body (T3 at 25:13-26, 66:12-14). Displaying the photograph clearly was proper to support the examiner's testimony in responding to the defense asserted by Petitioner. In any event, given the overwhelming evidence of Petitioner's guilt, including his own admissions, the receipt into evidence of the photograph could not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Bricht v. Abrahamson*, 507 U.S. at 623. Therefore, Petitioner is not entitled to habeas relief on this ground.

## G.   CORROBORATION

Petitioner argues that his "confession to murder in the second degree was not sufficiently corroborated by independent proof as required by state law." (Dkt. No. 1 at 7F.) This claim is not cognizable on federal *habeas* review because New York's confession corroboration rule[12] is "a state law requirement that embodies no federal constitutional principle." *Robinson v. Smith*, 530 F. Supp. 1386, 1390 (W.D.N.Y. 1982); *Yates v. Rivera*, No. 9:03-CV-1057 (LEK/DEP), 2007 WL 2027284, at *6 (N.D.N.Y. Jul. 9, 2007). Therefore, the Petition is denied on this

---

[12]    "A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense has been committed."  N.Y. Crim. Proc. Law § 60.50 (McKinney 2004).

ground.

**H.   SENTENCE**

Petitioner argues that his sentence of 25 years to life violates the Constitutional prohibition against cruel and unusual punishment.  (Dkt. No. 1 at 7G.)

The United States Supreme Court has noted that "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare ... [O]ne could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies ... the length of the sentence actually imposed is purely a matter of legislative prerogative." *Rummel v. Estelle*, 445 U.S. 263, 272-274 (1989) (denying *habeas* relief to petitioner sentenced to life with the possibility of parole under Texas recidivist statute following third felony conviction for obtaining $120.75 by false pretenses).  In the *habeas* context, a sentence violates the Eighth Amendment only in "exceedingly rare" and "extreme" cases, and only then if it is 'grossly disproportionate' to the crime. *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003). A sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense. *See White*, 969 F.2d at 1383; *Lou v. Mantello*, No. 98-CV5542, 2001 WL 1152817, at *13 (E.D.N.Y. Sept. 25, 2001); *see also Richardson v. Artuz*, No. 97-CV-2128 (JG), 2004 WL 556688 at *22 (E.D.N.Y. Mar. 22, 2004) (because a state prisoner's sentence fell within the range authorized by New York Penal Law, it "does not qualify for consideration as excessive under the Eighth Amendment").

Here, Petitioner was convicted of two counts of second degree murder, a class A-I felony. N.Y. Penal Law § 125.25 (McKinney 2004).  He was also convicted of two counts of second

degree robbery, a class C felony.  N.Y. Penal Law § 160.10 (McKinney 2004).  The authorized sentence for second degree murder is an indeterminate sentence of 15 or 25 years to life.  N.Y. Penal Law § 70.00 (McKinney 2004).  The sentencing range for second degree robbery is a determinate sentence of between 3.5 and 15 years.  N.Y. Penal Law § 70.02 (McKinney 2004.)  Petitioner has not challenged the validity of these statutes.  Thus, Petitioner's sentence of 25 years to life is within the limits of a valid state statute and is not cruel and unusual punishment in the constitutional sense.  Therefore, Petitioner is not entitled to *habeas* relief on this ground.

_____ **WHEREFORE**, based upon the foregoing, it is hereby

**ORDERED**, that the petition for a writ of habeas corpus (Dkt. No. 1) is **DENIED** and **DISMISSED**.  Furthermore, the undersigned finds that Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).  Therefore, no certificate of appealability will issue with respect to any of Petitioner's claims.

Dated: July 30, 2008
      Syracuse, New York

                                   George H. Lowe
                                 United States Magistrate Judge